# EXHIBIT 1

19 CV 000245

STATE OF NORTH CAROLINA
COUNTY OF ORANGE

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
FILE NUMBER:

ERIK SYVERSON,

Plaintiff,

vs.

RAINES FELDMAN, LLP, MILES FELDMAN, JONATHAN LITTRELL, RICHARD DECKER, ANDREW RAINES, ROBERT PARDO, AND JOHN DOE 1-10,

Defendants

**COMPLAINT FOR DECLARATORY JUDGMENT, INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS, JURY TRIAL DEMANDED**

The Plaintiff, Erik Syverson, complaining of the Defendants, Raines Feldman, LLP ("Raines"), John Doe 1-10 ("Does"), Miles Feldman aka "malpractice miles", Jonathan Littrell, Richard Decker aka "Richie the rug", Andrew Raines, and Robert Pardo, collectively referred to herein as ("Defendants"), alleges and says:

**PARTIES**

1. The Plaintiff, Erik Syverson, is a citizen and resident of Orange County, North Carolina. In May 2017 Plaintiff was diagnosed with a brain tumor at Cedars Sinai hospital in Los Angeles, California. Plaintiff underwent treatment for the brain tumor in Los Angeles until December 2017 when Plaintiff moved to Chapel Hill, NC in order to continue treatment at Duke University's world-renowned Tisch brain tumor center.
2. Defendant Raines is a California limited liability partnership operating as a law firm in Los Angeles, California at 1800 Avenue of the Stars, 12th Floor.
3. Defendant Miles Feldman is a partner at Raines and commonly known in the Los Angeles legal community as "malpractice Miles" due to several malpractice lawsuits filed against him during his career in addition to poor outcomes for clients as well as difficulty collecting attorney fees from clients.
4. Defendant Jonathan Littrell is managing partner of Raines despite having never worked at another law firm in his career much less serve as a managing partner. His practice is devoted to facilitating the financing of and distribution of drugs deemed illegal under federal law.

5. Defendant Richard Decker is known as "Richie the rug" in the Los Angeles legal community due to his fake hair as well as history of mistreatment of female co-workers. While plaintiff was employed at Raines, "the rug" unilaterally terminated Plaintiff's secretary because she made "the rug" feel uncomfortable. No further explanation was offered as Plaintiff's secretary worked for Plaintiff and not "the rug". Additionally, "the rug" encourages his associates to overbill his health insurance clients such as Anthem Blue Cross. Once caught by his clients, "the rug" offered up his only female associate as a sacrificial lamb. "The rug" terminated her just after she gave birth to a baby boy.

6. Defendants Robert Pardo and Andrew Raines are a long time homosexual married couple and founded Raines over a decade ago prior to their marriage in California.

7. Whenever any reference is made herein to the term "Does", this shall refer not only to Does, but shall also include their respective employees, agents, servants, contractors, subcontractors, predecessor corporations or companies, successor corporations and companies, subsidiaries, divisions and assigns, and in all respects, those persons acting at the direction of, on behalf of, or at the request of, Does.

**JURISDICTION**

8. Plaintiff requests declaratory relief against Defendants, pursuant to Rule 57 of the Rules of Civil Procedure and the Uniform Declaratory Judgment Act, N..C Gen. Stat. 1-253 and 1-254, *et seq*. This Court has jurisdiction of this action and authority to issue a declaratory judgment in this action pursuant to the provisions of the Uniform Declaratory Judgment Act, N.C. Gen. Stat. 1-253 and 1-254, *et seq*., because an actual controversy exist between Plaintiff and Defendants with respect to the construction of an agreement entered into between Plaintiff and Defendants in February, 2018 (the "agreement"). A true and accurate copy of the agreement is attached hereto as Exhibit A.

**THE MAN WHO KNEW TOO MUCH, FACTS COMMON TO ALL CLAIMS FOR RELIEF**

9. While working at Raines, Syverson witnessed a shocking amount of misdeeds and illegal behavior committed by Raines and its lawyers Andrew Raines, Robert Pardo, Jonathan Littrell, Richard Decker and Miles Feldman. This behavior includes aiding and abetting the financing of the illegal drug trade in violation of the RICO act and federal narcotics laws, abuse of women, pressure to donate to certain political candidates and intolerance of traditional family values including forcing women to work weekends during their maternity leave.

10. Raines lawyers Jonathan Littrell, Andrew Raines, Robert Pardo all performed a staggering amount of legal work to enable the financing and distribution of marijuana and other schedule 1 narcotics. Marijuana is illegal under federal law and classified as a schedule 1 narcotic. Raines and the forementioned lawyers all knew this. Despite knowing its illegality, Raines and its lawyers performed a massive amount of work for a company called Med Men. Med Men finances and invests in the marijuana trade. In fact, Raines performed so much work for Med Men that it embedded its managing partner Jonathan Littrell onsite at Med Men's Culver City offices. Raines did so even though it jeopardized its relationship with its largest client Brad Cohen and Cohen Asset Management ("CAM"). Raines pulled Littrell off CAM legal matters so that he could work on Med Men marijuana matters. Raines did not inform CAM timely of this change. In fact, knowing the illegality of Littrell's work for Med Men, Andrew Raines sent a firm wide memo advising all employees to shut up and not talk about Littrell's placement onsite at Med Men.

11. Plaintiff did not take kindly to Raines' work in marijuana finance. Plaintiff personally advised many Raines lawyers to not work on such matters because it could subject them and others to criminal prosecution under many federal statutes including the RICO Act. Such objections did not make Plaintiff popular with Andrew Raines, Miles Feldman, Jonathan Littrell and Robert Pardo.

12. In order to launder drug money, Andrew Raines advised Plaintiff that he and his husband Robert Pardo, had formed many shell LLC's to participate in the marijuana trade. It is

unknown whether there was ever any crossover between CAM funds and Med Men funds in Raines' trust account or operating accounts.

13. Often, in order to distance themselves from the marijuana work, partners Andrew Raines, Robert Pardo, and Jonathan Littrell would employ young, inexperienced and naïve lawyers to do their dirty work. For example, a favorite Raines' tactic would be to hire low level law school graduates in desperate need of employment. Only there was one problem with this scheme, most could not pass the California bar exam. Five of six such hires failed the bar exam. An embarrassing percentage by any standard. Nevertheless, such youthful lawyers were kept around to do Med Men dirty work to the extent they could. This provided the buffer zone Andrew Raines and Robert Pardo needed. Plausible deniability.

14. Raines kept up its marijuana work fully aware that it violated federal law. Upon the appointment of AG Jeff Sessions, Raines corporate department held a meeting to discuss the likelihood of criminal prosecution against the firm and its lawyers. Consensus was, at Raines, that Donald Trump would be impeached, Sessions would be gone or too weak to prosecute and the financial reward outweighed the criminal risk.

15. In order to send a signal that marijuana was the future of Raines, upon being embedded onsite at Med Men, Jonathan Littrell was appointed managing partner of the firm. This title was awarded by Robert Pardo, the outgoing managing partner, despite the fact that Jonathan Littrell was by far, the most inexperienced, least credentialed lawyer at Raines. He was only approximately thirty-five years old at the time of appointment and had never worked at any law firm other than Raines. His only apparent success had been that he brought Med Men into the firm as a client. Raines wanted to send the signal that crime pays and it pays handsomely at Raines.

16. Abuse of women was rampant at Raines, a firm founded by two married men, Andrew Raines and Robert Pardo. In particular, Robert Pardo made his contempt for women no secret. Upon the hiring of openly Lesbian partner, Robert Pardo referred to her as the "man dude" and difficult – typical of Lesbians according to the openly gay Robert Pardo. Robert Pardo also

often commented that all women, including his sisters and mother were nuts and difficult. He espoused that is why he chose a gay lifestyle because women are too difficult to get along with. This bore true for Robert Pardo and Richard Decker.

17. Richard Decker's problems with women were well known at Raines.

18. Richard Decker has a very specialized practice representing health insurers in arbitration proceedings against hospitals. Because of the nature of his work, he and his team of lawyers could not charge high hourly rates and could not attract well credentialed talent. Therefore, in order to make the money he needed, Richard Decker encouraged his team of lawyers to overbill their time in order to make his numbers. When clients objected to this overbilling, Richard Decker always had a fall guy or, more accurately, fall lady.

19. One such unfortunate lady, Jane Doe 1 was fired by Richard Decker shortly after giving birth to her first child. Richard Decker encouraged her to bill clients like Blue Cross and HealthNet very aggressively yet blamed her when she did so and fired her. Not satisfied with firing her, when she threatened to sue Raines, Richard Decker embarked on a character assassination campaign. Jane Doe 1, the daughter of Persian immigrants, was just another money hungry Persian woman according to Richard Decker. In order to silence Jane Doe 1, Raines resorted to its standard playbook – the confidential settlement.

20. Richard Decker's cruelty and mis-treatement of women extended beyond those women working directly for him. He had Plaintiff's secretary ("Jane Doe 2") fired simply because she made him feel "uncomfortable" in the hallways and elevators of the firm. Plaintiff was very happy with Jane Doe 2's performance. Nevertheless, Richard Decker and Robert Pardo fired he,r despite the fact that she was battling a life-threatening chronic illness and that Plaintiff, her supervising partner, was happy with her work.

21. Former partner Sonia Lee is another woman who was blamed for the failures of men at Raines. This time Miles Feldman was the lawyer in need of a fall lady. Feldman, is a name partner at Raines and the titular head of litigation. However, by most objective accounts and according to most Raines lawyers, he is a complete and utter failure and embarrassment to the

firm. Many former Raines lawyers left the firm in part due to Feldman's incompetence, lack of business and firm worst collection rate.

22. In 2017, with his embarrassing performance becoming hard to ignore, Feldman fired Sonia Lee because "she was bringing down the entire litigation department". Sonia Lee had no effect on Plaintiff's business which generated seven figures annually for Raines.

23. The Firm went through a collective mental breakdown with the election of Donald Trump as President. With many well known Republican clients such as Andrew Puzder, Plaintiff further placed himself in the crosshairs of Raines management.

24. The day after Trump's election, Andrew Raines called a firm wide meeting during which Robert Pardo threw a temper tantrum calling Trump and all his supporters Nazis. When Plaintiff reminded Robert Pardo that many if not most Raines clients were Republican real estate investors/developers, Robert Pardo stated "we do not represent any Republicans and never will". Such unhinged behavior by a managing partner, including several anti-Republican tweets, made it impossible for Plaintiff to remain at Raines. At the time of Trump's election and the ensuing Raines meltdown, Plaintiff represented many prominent Republicans in addition to liberal luminaries including several Academy Award winning Actors.

25. On the other hand, Feldman had no such prominent clients. When Plaintiff fell ill with brain cancer, Feldman saw his chance to meddle in Plaintiff's thriving litigation practice specializing in cyber liability matters.

26. Plaintiff clung to life in the ICU at Cedars Sinai hospital in October 2017 from severe chemotherapy side effects. To be specific, Plaintiff had no immune system left, zero white blood cells and no platelets. At the same time, Feldman advised Plaintiff's associates and team of lawyers not to work too much on Plaintiff's matters because his future was uncertain. This type of cowardly betrayal was typical of Feldman's jealous, passive aggressive demeanor. When brought to Plaintiff's attention, he immediately notified Jonathan Littrell

and Andrew Raines. Not only were Plaintiff's phone calls and concerns ignored, Littrell blamed Plaintiff for making the report referring to it as inappropriate.

27. After Littrell referenced Plaintiff's actions as inappropriate, Littrell cut off Plaintiff's health insurance and bi-monthly partner draw. In turn, Plaintiff left the firm immediately and founded the law firm of Syverson, Lesowitz & Gebelin, LLP in Beverly Hills, CA the same week he moved his family to Chapel Hill.

28. Although Plaintiff had left Defendants behind, Defendants could not leave behind their animus toward Plaintiff. Defendants then embarked on a harassment campaign. Having left Raines, Plaintiff revealed publicly the misdeeds performed by Defendants via social media on his Twitter account and LinkedIn. Obviously, embarrassed greatly by their behavior, Defendants sought to buy Plaintiff's silence via the agreement.

29. The agreement provides for arbitration of any disputes related to the agreement. It also provides a termination clause that may be invoked by the non-breaching party.

30. Defendants immediately began to use the agreement as a tool of constant harassment. This began in April 2018 when Plaintiff, back in Los Angeles for the first time since completing cancer treatment and moving to Chapel Hill, took a picture in front of the building he used to work in. In a fit of unfathomable pettiness, Defendants refused to allow Plaintiff into his office to reclaim his personal effects after resigning. The picture taken was in front of a sign identifying tenants Wells Fargo and Raines. Plaintiff posted the picture on his Twitter account to celebrate his survival of brain cancer. The next day, Plaintiff received an email from attorney Laura Anson of Lewis Brisbois claiming that the picture violated the agreement and requested that it be removed. Plaintiff disagreed but for the sake of moving on immediately removed it. Ms. Anson agreed that this removal solved the issue and waived any legal claims resulting from the picture. A true and correct copy of Ms. Anson's waiver is attached hereto as Exhibit "B".

31. Despite this clear and unequivocal waiver, Defendants have continued to use this picture as the basis of a never-ending arbitration campaign of harassment toward Plaintiff. This

campaign is intended to cause Plaintiff both financial and emotional damage and distress. Defendants have used the picture as a basis of no less than three frivolous arbitration demands before JAMS. Each and every JAMS arbitrator assigned has been in the pocket of Defendants having relied upon Defendants for high volumes of business. As such, each JAMS arbitrator, all four, have been disqualified for conflicts of interest. The fix is in.

32. In addition to the picture claim, Defendants have leveled a number of other frivolous claims against Plaintiff in various iterations of the demand for arbitration. Such ridiculous claims include that Plaintiff harassed and interfered with Defendants' business merely by serving third party deposition subpoenas in relation to a lawsuit Plaintiff filed in this Court in July 2018. In that case entitled Syverson v. John Doe, an anonymous tortfeasor sent harassing emails to Plaintiff claiming to work at Raines and be of relation to Andrew Raines. Plaintiff never filed suit against Defendants. Opting for the cautious approach, Plaintiff sued John Doe and served subpoenas on various lawyers at Raines so that they could clear their name under oath. Relevant Internet service providers such as Google were also subpoenaed. Plaintiff's lawsuit was successful in identifying the John Doe defendant so quickly that he withdrew all deposition subpoenas served upon Raines and its employees. Plaintiff reached a confidential settlement with John Doe and per the agreement, John Doe's identity is confidential. Nevertheless Defendants continue to use a lawsuit where they were merely third party witnesses as a means to harass and instigate pointless demands for arbitration.

33. Tired of the continued harassment, when Plaintiff learned that Jonathan Littrell had violated the agreement, Plaintiff invoked the termination clause meaning that Plaintiff was no longer bound by the terms of the agreement, however, the Defendants continue to be bound. Furthermore, Defendants filed a motion to compel yet another frivolous arbitration in Santa Monica, CA after receiving Plaintiff's termination notice. Providing further grounds for termination of the agreement, Defendants attached a demand for JAMS arbitration that severely disparaged Plaintiff. As such, even though unnecessary, Plaintiff served Defendants with yet another termination of the agreement.

34. Despite the termination of the agreement, Defendants persist in pursuing frivolous claims before a compromised adr provider ("JAMS"). Defendants dispute that the agreement has been terminated. A real and ripe controversy exists in that Plaintiff asserts the agreement has been terminated. True and correct copies of the terminations are attached hereto as Exhibit "C".

**FIRST CLAIM FOR RELIEF**

**INTENTIONAL INFLICATION OF EMOTIONAL DISTRESS**

35. Plaintiff hereby incorporates by reference the allegations of paragraphs 1 through 34 in support of this claim for relief.

36. The actions of the Defendants as alleged herein constitute extreme and outrageous conduct and show a reckless indifference to the likelihood that said actions would cause severe emotional distress to the Plaintiff.

37. The actions of the Defendants as set forth herein were undertaken for the purpose of embarrassing, humiliating, harassing and retaliating against the Plaintiff.

38. Defendants knew, or reasonably should have known, that their behavior would cause emotional distress to the Plaintiff, and, in fact, Defendants' conduct proximately resulted in injury and damage to the Plaintiff, as set forth herein.

39. Plaintiff's emotional distress, as a result of the actions of the Defendants alleged herein, was severe and disabling.

40. Plaintiff has suffered compensatory damages as a proximate result of the Defendants' conduct in an amount in excess of One million dollars ($1,000,000.00).

41. Defendants' conduct was extreme and outrageous and recklessly indifferent to the rights of Plaintiff and likely to cause severe emotional distress to Plaintiff, therefore justifying that Plaintiff receive punitive damages in an amount in excess of Three million Dollars ($3,000,000.00).

42. Plaintiff has been forced to incur attorney's fees in order to enforce his rights and is entitled to recover reasonable attorney's fees necessary for the prosecution of this action.

**SECOND CLAIM FOR RELIEF, CLAIM FOR DECLARATORY JUDGMENT**

43. Plaintiff repeats and re-alleges the allegations in Paragraphs 1 through 43 of this Complaint.

44. Plaintiff requests a declaratory judgment, pursuant to the provisions of Rule 57 of the Rules of Civil Procedure and the Uniform Declaratory Judgment Act, N.C. Gen. Stat. 1-253 and 1-254, *et seq.*, that the agreement has been terminated by Plaintiff and, as such, Plaintiff is no longer bound by any terms of the agreement, however, Defendants remain so bound.

45. An actual controversy exists between Plaintiff and Defendants with respect to the construction of the agreement.

46. The terms of the agreement clearly provide that upon a breach of the agreement, the non-breaching party may elect to terminate the agreement via written notice. Plaintiff provided such written termination notice. As such, the agreement has been terminated by Plaintiff and Plaintiff is no longer bound by its terms.

WHEREFORE, the Plaintiff prays that he recover of the Defendants, jointly and severally, as follows:

1. Compensatory damages for his injuries and damages for intentional infliction of emotional distress in an amount in excess of One million and 00/100 Dollars ($1,000,000.00), and punitive damages for his injuries and damages in an amount in excess of Three million Dollars ($3,000,000.00), plus interest from the date of filing of this Complaint until judgment is paid and satisfied in full, pursuant to N.C.G.S. 24-5;
2. Reasonable attorney fees, pursuant to N.C.G.S. 6-21.1 as an element of costs;
3. That all issues be tried by a jury;
4. That the Court issue a declaratory judgment, pursuant to the provisions of Rule 57 of the Rules of Civil Procedure and the Uniform Declaratory Judgment Act, N.C. Gen. Stat. 1-253 and 1-254, *et seq.*, declaring that the Agreement has been terminated and Plaintiff is not bound by its terms.
5. Such other and further relief as to the Court may seem just and proper.

This the Eighteenth day of February, 2019.

Erik Syverson, in pro per
101 Painted Turtle Lane
Chapel Hill, NC 27516

# EXHIBIT A

## SETTLEMENT AGREEMENT

THIS SETTLEMENT AGREEMENT (this "**Agreement**") is made and entered into on February 6, 2018 (the "**Effective Date**") by and between Erik Syverson, an individual ("**Syverson**") on the one hand, and Raines Feldman LLP, a California limited liability partnership ("**RF**"), Andrew Raines, an individual ("**Raines**"), Miles Feldman, an individual ("**Feldman**"), Richard Decker, an individual ("**Decker**"), Robert Pardo, an individual ("**Pardo**") and Jonathan Littrell, an individual ("**Littrell**" and together with RF, Raines, Feldman, Decker and Pardo, the "**RF Parties**") on the other hand. Syverson and the RF Parties may be referred to herein individually as a "party" or collectively as the "parties."

**RECITALS:**

A. WHEREAS, Syverson was engaged by RF pursuant to that certain Term Sheet dated as of June 10, 2014;

B. WHEREAS, Syverson terminated his engagement with RF on November 16, 2017 (the "Termination Date"); and

C. WHEREAS, the parties desire to settle and fully terminate each and every one of the disputes that exist between each other in a mutually satisfactory manner on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the foregoing recitals, the mutual promises contained herein, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto agree as follows:

1. **Payment to Syverson.** Conditioned upon Syverson's continued satisfaction of the promises and covenants contained in this Agreement, RF shall pay Syverson for personal physical injuries in the following amounts and at the following times:

a. *First Payment:* RF shall pay Syverson One Hundred Thousand Dollars and No/100ths ($100,000.00) (the "**First Payment**"), which First Payment will be paid in one lump sum on the later to occur of (i) the second business day after the expiration of the revocation period provided for in Section 7b, or (ii) Syverson's delivery of the Take Down Notice (as provided in Section 9b hereof) to the RF Parties. The parties to this Agreement hereby acknowledge that a portion of this sum, specifically Fifty Thousand Dollars and No/100ths ($50,000.00), is being paid in release of each of the Syverson's rights under the Age Discrimination in Employment Act of 1967 (and the Older Worker's Benefit Protection Act.).

b. *Monthly Installments*: On March 1, 2018, and the first day of each month thereafter until February 1, 2019, RF shall pay to Syverson twelve (12) equal monthly instalments of Ten Thousand Dollars and No/100ths ($10,000.00) (the "**Monthly Installments**" and together with the First Payment, the "**Payments**").

c. Remedies. Upon a party's failure to satisfy the promises and conditions set

forth in this Agreement, in addition to all other remedies available to the other parties under this Agreement, the non-breaching parties may, in their sole and absolute discretion, terminate this Agreement upon at least twenty four (24) hours written notice to the parties, and upon such termination all obligations of the non-breaching parties under this agreement shall cease.

2. **Accrued Vacation.** Syverson acknowledges and agrees that on the Termination Date, RF paid any and all accrued vacation days due and owing to him under his respective agreements with RF (the "**Vacation Pay**").

3. **No Additional Benefits; Receipt of All Wages; Consideration.** Syverson acknowledges and agrees that the Payments, Vacation Pay and releases are consideration that he would not otherwise be entitled to receive but for his signing of this Agreement. Syverson agrees that, upon receiving the Payments and/or Vacation Pay, he will have received an amount in excess of wages, penalties, premiums, PTO, vacation, reimbursements, bonuses and commissions due and owed to him during his engagement with RF. Syverson agrees and acknowledges that he has received all wages and other compensation or remuneration of any kind due or owed from RF, including but not limited to all wages, rest periods, meal periods, vacation pay, bonuses and any other incentive-based compensation to which Syverson may become entitled or eligible up to and through the Effective Date.

4. **Release of Claims – RF Parties.** Effective as of the Effective Date, and in consideration of the releases, promises and covenants of Syverson in this Agreement, each of the RF Parties and their respective agents, servants, representatives, officers, directors, stockholders, partners and employees, and specifically including, but not limited to attorneys, parent corporations, subsidiaries, affiliates, predecessors and successors in interest and assigns of the RF Parties hereby releases and forever discharges Syverson and each of his respective agents, servants, representatives, officers, directors, stockholders, partners and employees, and specifically including, but not limited to attorneys, parent corporations, subsidiaries, affiliates, predecessors and successors in interest and assigns of Syverson (collectively, the "**Syverson Releasees**") from any and all claims, demands, obligations, actions, causes of action, liabilities, and losses of every kind and nature whatsoever and from any and all liability for claims known or unknown arising prior to the Effective Date except for those which, as a matter of law, cannot be waived.

5. **Release of Claims – Syverson.** Effective as of the Effective Date, and in consideration of the releases, promises and covenants of the RF Parties in this Agreement, Syverson for himself and his respective agents, servants, partners, employees, affiliates, predecessors and successors in interest and assigns hereby releases and forever discharges the RF Parties and each of their respective agents, servants, representatives, officers, directors, stockholders, family members, partners and employees, and specifically including, but not limited to attorneys, parent corporations, subsidiaries, affiliates, predecessors and successors in interest and assigns of the RF Parties (collectively, the "**RF Releasees**") from any and all claims, demands, obligations, actions, causes of action, liabilities, and losses of every kind and nature whatsoever and from any and all liability for claims known or unknown arising prior to the Effective Date except for those which, as a matter of law, cannot be waived (*e.g.* claim for unemployment insurance benefits). This release includes, without limiting the generality of the foregoing: any and all claims, demands, causes of action, obligations, charges,

damages, liabilities, attorneys' fees and costs relating to, arising out of, or based upon claims of harassment, discrimination, and/or retaliation in violation of local, state or federal law, including discrimination on account of race, color, religion, sex, sexual orientation, age, citizenship, national origin, physical handicap, mental or physical disability, medical condition, genetic characteristic, marital status, pregnancy, veteran status or any other discrimination prohibited by such laws, ordinances, regulations or orders (including but not limited to Title VII of the Civil Rights Act of 1964, as amended, 42 USC Section 2000, et seq.; Americans with Disabilities Act; Civil Rights Act of 1866, and Civil Rights Act of 1991; 42 USC Section 1981, et seq.; Age Discrimination in Employment Act, as amended, 29 USC Section 621, et seq.; Equal Pay Act, as amended, 29 USC Section 206(d); regulations of the Office of Federal Contract Compliance, 41 CFR Section 60, et seq.; California Fair Employment and Housing Act, California Government Code Section 12940, et seq.; and the Unruh Civil Rights Act, California Civil Code Section 51, et seq.); all claims for violation of California *Business and Professions Code* Section 17200, *et seq.*, and/or the California *Labor Code* including, but not limited, to claims for alleged misclassification of worker status and claims under the Labor Code Private Attorneys General Act ("PAGA"), claims for failure to pay wages, overtime pay, meals and rest breaks, waiting time penalties, severance pay, commissions, relocation expenses, bonuses, sick leave, holiday pay, vacation pay; all claims for all claims of violation of public policy, and claims for violation of federal or state common law including a claim for wrongful and/or constructive termination of employment; all claims based on tort, including claims for assault, battery, and sexual battery, and/or breach of contract, whether written or oral, express or implied, and any covenant of good faith and fair dealing; any claim for unlawful or unfair business practices; all claims for intentional or negligent infliction of emotional distress; all claims for defamation, invasion of privacy, breach of employment contract, fraud or negligent misrepresentation, intentional interference with contractual relations and prospective economic advantage any and all claims which were or could have been asserted by any of Syverson prior to the Effective Date; and all claims generally relating to Syverson's employment and/or engagement with RF and the cessation thereof, including any alleged violation of any federal, state or other governmental statute, regulation or ordinance. This Agreement specifically excludes and does not release any Claim pursuant to California Labor Code Section 2802 and any other claim that an employee cannot legally release (including but not limited to any claim Employee may have for workers' compensation). This release in all respects has been voluntarily and knowingly executed with the express intention of effecting the legal consequences provided in California *Civil Code* § 1542, that is, the extinguishment of obligations herein designated. Notwithstanding the foregoing, the release in this paragraph does not include claims for vested and accrued benefits under any benefit plan that is subject to the Employee Retirement Income Security Act of 1974 as amended.

6. **Civil Code Section 1542 Waivers.** The parties intend that the foregoing releases shall be effective as a full and final accord and satisfaction of all claims released hereby as to the matters covered by the releases (the "**Released Matters**"), and, accordingly, as to the Released Matters further agree that the provisions of California *Civil Code* § 1542 are waived. California *Civil Code* § 1542 provides as follows:

> "SECTION 1542. A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT



JL

> KNOW OR SUSPECT TO EXIST IN HIS, HER OR ITS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM, HER OR IT MUST HAVE MATERIALLY AFFECTED HIS, HER OR ITS SETTLEMENT WITH THE DEBTOR."

Except as otherwise expressly provided in this Agreement, the parties (a) agree that this Agreement shall be effective as a bar, waiver and release of each and every known or unknown claim, demand, cause of action, obligation, damage, and/or liability mentioned in this Agreement and (b) agree that it is their intent to provide a full and final release of all claims against and obligations of any and all parties to this Agreement, including claims and obligations that are not presently known or anticipated. The waivers and releases of this Agreement do not include any claims that cannot be released by law or any rights that may arise after the date this Agreement is executed.

7. **Release of Federal Age-Related Claims.** Syverson, for himself and for his heirs, executors, administrators, successors, and assigns, does hereby fully and forever release and discharge the RF Parties and their present and former shareholders, partners, members, employees, agents, directors, officers, attorneys, insurers and re-insurers, predecessors, successors, assigns, heirs, executors, administrators, related entities, affiliated entities, and all other persons, firms, corporations, associations, partnerships from any and all claims, demands, causes of action, charges and grievances, of whatever kind or nature, whether known or unknown, suspected or unsuspected, that Syverson now owns or holds or has at any time before this date owned or held against any of them for age discrimination under the federal Age Discrimination in Employment Act of 1967 (and the Older Workers Benefit Protection Act). Syveson does not waive any rights or claims that may arise **after** the date this agreement is executed.

a. Period for Review and Consideration of Agreement. Syverson confirms that he has been given twenty-one (21) days to review and consider this Agreement before signing it. Syverson understands that he may use as much or as little of this period as he wishes prior to signing the Agreement.

b. Syverson's Right to Revoke Waiver Claims under the ADEA (and ADEA Only). In order to comply with the Older Workers Benefits Protection Act (29 U.S.C. Section 626(f)) and effectuate the release by Syverson of any potential claims under the Federal Age Discrimination in Employment Act of 1967 ("**ADEA**"), Syverson agrees that he has carefully reviewed this Agreement and understands the terms and conditions it contains. By entering into this Agreement, Syverson is giving up potentially valuable legal rights under the ADEA in exchange for the consideration paid, and he intends to be bound by all the terms and conditions set forth in this Agreement. Syverson acknowledges that the consideration given for this waiver and release is in addition to anything of value to which he was already entitled. He is entering into this Agreement freely, knowingly, and voluntarily. He has been advised to consult legal counsel before executing the Agreement, and has, in fact, been represented by counsel at all stages of the negotiation of this Agreement. If this Agreement is signed by Syverson and returned to the designated representative of the RF Parties within the time specified in Section

7a, Syverson may revoke the release of ADEA claims only, within seven (7) calendar days of the Effective Date. Revocation must be made by delivering a written notice of revocation to the designated representative of the RF Parties and must be received no later than the close of business on the seventh (7th) calendar day (or next business day thereafter, if the seventh calendar day is not a business day) after the Effective Date. If Syverson revokes any ADEA claims under this Agreement, this Agreement shall not be effective or enforceable as to any rights Syverson may have under the ADEA. In addition, this Release eliminates all penalties, such as attorneys' fees, for any action brought by Syverson challenging the validity of the ADEA waiver. In the event Syverson revokes the release of ADEA claims, he will not be entitled to Fifty-Thousand Dollars ($50,000) of the Settlement Payment and will receive only One Hundred Seventy Thousand Dollars ($170,000.00) as consideration for the general release set forth in Section 5.

8. **Medicare and Social Security Liens and Benefits.** Syverson warrants and represents that he presently is not, nor has he ever been enrolled in Medicare Part A or Part B, or any state equivalent. Further, Syverson represents and warrants that he has no claim for Social Security Disability benefits nor is he appealing or re-filing for Social Security Disability benefits. Syverson agrees to indemnify and hold harmless the RF Parties from any claims of, or rights of recovery as a result of any future payment which may be made by Medicare or any other entity for or on behalf of Syverson for such future care. Syverson agrees to hold harmless the RF Parties for any loss of Medicare benefits or Social Security benefits Syverson may sustain as a result of this Agreement. In addition, Syverson agrees, as part of this Agreement, to release any right to bring any possible future action under the Medicare Secondary Payer Statute against the RF Parties. Syverson has been apprised of his right to seek assistance from legal counsel or directly from the Social Security Administration or other government agencies regarding the impact this Release may have on Syverson's current or future entitlement to Social Security or other governmental benefits. Syverson acknowledges that acceptance of these settlement funds may affect Syverson's rights to other governmental benefits, insurance benefits, disability benefits, or pension benefits.

a. MEDICARE CONFIRMATION Definitions:

1. **"Conditional Payments"** shall have the meaning ascribed to it under the MSP Statute and implementing regulations.

2. **"MMSEA"** means the Medicare, Medicaid, and SCHIP Extension Act of 2007 (P.L. 110-173), which, in part, amended the Medicare Secondary Payer statute at 42 U.S.C. § 1395y(b)(7) and (8). This portion of MMSEA is referred to herein as "Section 111 of MMSEA".

3. **"MSP Statute"** means the Medicare Secondary Payer ("MSP") statute. 42 U.S.C. § 1395y(b).

b. Syverson represents that he is not enrolled in the Medicare program and was not enrolled at any time prior to the date of this Agreement.



RV

c. Syverson and Syverson's counsel represent and warrant that the information provided to the parties being released herein for confirmation of Syverson's Medicare status, including Syverson's name, gender, date of birth, and Social Security Number, is complete, accurate, and current as of the date of this Agreement.

d. Syverson represents and warrants that no Medicaid payments have been made to or on behalf of Syverson and that no liens, claims, demands, subrogated interests, or causes of action of any nature or character exist or have been asserted arising from or related to any Released Claims Syverson counsel, to the best of their knowledge, represent and warrant that no Medicaid payments have been made to or on behalf of Syverson and that no liens, claims, demands, subrogated interests, or causes of action of any nature or character exist or have been asserted arising from or related to any Released Claims. Syverson and Syverson's counsel further agree that Syverson, and not the RF Parties, shall be responsible for satisfying all such liens, claims, demands, subrogated interests, or causes of action that may exist or have been asserted or that may in the future exist or be asserted with respect to the Released Claims.

e. Syverson agrees to indemnify and hold harmless the RF Parties herein from any and all claims, demands, liens, subrogated interests, and causes of action of any nature or character that have been or may in the future be asserted by Medicare and/or persons or entities acting on behalf of Medicare, or any other person or entity, arising from or related to this Agreement, the payment of the Settlement Sum, any Conditional Payments made by Medicare, or any medical expenses or payments arising from or related to any claim released herein that is subject to this Agreement or the release set forth herein, including but not limited to: (a) all claims and demands for reimbursement of Conditional Payments or for damages or double damages based upon any failure to reimburse Medicare for Conditional Payments; (b) all claims and demands for penalties based upon any failure to report, late reporting, or other noncompliance with or violation of Section 111 of MMSEA that is based in whole or in part upon late, inaccurate, or inadequate information provided to the RF Parties by Syverson or Syverson's counsel or upon any failure of Syverson or Syverson's counsel to provide information; and (c) all Medicaid liens. This indemnification obligation includes all damages, double damages, fines, penalties, attorneys' fees, costs, interest, expenses, and judgments incurred by or on behalf of the RF Parties in connection with such claims, demands, subrogated interests, or causes of action.

9. **Non-disparagement; No Mention.**

a. Non-disparagement of RF Parties. For and in consideration of the releases, promises and covenants of the RF Parties in this Agreement Syverson covenants and agrees that as and from the Effective Date and at any time thereafter, Syverson on behalf of himself and his respective agents, servants, partners, employees, affiliates, predecessors and successors in interest and assigns will refrain from making, and will not cause any other person or entity to make any disparaging statements about any of the RF Releasees or any of their respective family members, employees, contractors, representatives or clients (collectively, the "**RF Protected Parties**"). Such prohibited disparaging statements would include, without limitation, any and all verbal or written disparaging communications (including, without limitation, emails, texts and posts and comments on social media outlets such as twitter, facebook, linkedin, etc.) relating to the

past, present or future business, ownership, management, operations, services, clients, compliance, products, intellectual property, financial standing, performance, education, political affiliation, religious beliefs, sexual orientation, bar passage, client billing, or employment/compensation/benefit practices (collectively "**Prohibited Communication**") of any of the RF Protected Parties. This does not prohibit Syverson from complying with any lawful subpoena or other legal process for provision of information regarding RF Parties or RF Protected Parties.

b. Removal of Prohibited Communication. In furtherance of the foregoing and as a condition to the making of the First Severance Payment and the Monthly Severance Installments, Syverson agrees to completely remove and permanently delete, within forty eight (48) hours of the Effective Date, any and all Prohibited Communication posted by Syverson or any affiliate thereof (including without limitation fictional characters or aliases) on or prior to the Effective Date and relating in any way to the RF Protected Parties. Syverson shall deliver written notice to the RF Parties of his compliance with the covenants set forth in this Section 9b (the "**Take Down Notice**"). Within forty eight (48) hours of receiving the Take Down Notice, RF Parties shall confirm in writing that Syverson has removed all Prohibited Communication (such notice, a "**Confirmation Notice**"). If any Prohibited Communication that was made prior to the Effective Date is discovered by the RF Parties subsequent to the Confirmation Notice, the RF Parties shall notify Syverson and Syverson shall delete such Prohibited Communication within twenty four (24) hours of receipt of such notice (the "**Cure Period**"). If Syverson is unable to delete such Prohibited Communication within the Cure Period (after good faith efforts to do so), Syverson shall provide the RF Parties with a copy of a written request for deletion by Syverson to the host of such Prohibited Communication within the Cure Period. Such subsequent removal or request for removal of Prohibited Communication within the Cure Period shall not be deemed a breach of this Agreement.

c. No Mention. In furtherance of the Syverson's obligations under Section 7a, Syverson covenants and agrees that as and from the Effective Date and at any time thereafter, Syverson will refrain from making, and will not cause any other person or entity to make, any statements on social media or any other publication about any of the RF Parties or any of their respective family members, employees, contractors or representatives.

d. Non-disparagement of Syverson. For and in consideration of the releases, promises and covenants of the Syverson in this Agreement, RF Parties covenant and agree that as and from the Effective Date and at any time thereafter, the RF Parties will refrain from making, and will not cause any other person to make, any disparaging statements about Syverson. Such prohibited disparaging statements would include, without limitation, any and all Prohibited Communication regarding Syverson. This does not prohibit the RF Parties from complying with any lawful subpoena or other legal process for provision of information regarding Syverson.

e. Liquidated Damages. Notwithstanding anything to the contrary contained herein, and subject to the Cure Period, if any of the Syverson on the one hand, or if any of the RF Parties on the other hand, breach the non-disparagement provisions of this Section 9, it being understood that any written communication containing Prohibited Communication posted or disseminated by the parties, will serve as prima *facie evidence* of such breach, the aggrieved



JV

party shall be entitled to recover from the offending parties (on a joint and several basis) liquidated damages in the amount of Twenty Five Thousand Dollars ($25,000.00) per single publication. ALL PARTIES AGREE THAT THE LIQUIDATED DAMAGES SET FORTH HEREIN ARE PRESUMED TO BE THE REASONABLE AMOUNT OF DAMAGE ANTICIPATED FOR A BEACH OF THIS SECTION 9. AND FURTHER AGREE THAT IT WOULD BE IMPRACTICAL OR EXTREMELY DIFFICULT TO FIX THE ACTUAL DAMAGES DUE TO A BREACH.

*Syverson Initials Agreeing to Liquidated Damages Clause*

*RF Parties Initials Agreeing to Liquidated Damages Clause*

10. **Duplicative Website Content**. The RF Parties covenant and agree that, within twenty four (24) hours of the Effective Date, the RF Parties will instruct Justia in writing to commence the removal of all content and meta-data identified on Exhibit "A" attached hereto (the "Duplicative Content") from the firm's website (www.raineslaw.com) (the "Website"). The parties acknowledge and agree that, RF shall not be prohibited from creating its own content on subject matters similar to the subject matter discussed in the Duplicative Content, but that RF shall not use the Duplicative Content on the Website subsequent to the Effective Date. RF shall provide Syverson with a copy of the written request to remove Duplicative Content within 24 hours of propounding said written notice to Justia.

11. **Dismissal of Action**. For and in consideration of the covenants, promises and representations and warranties of the parties set forth herein, the parties shall execute and deliver that certain Stipulated Dismissal of Action with Prejudice attached hereto as Exhibit "B" (the "**Dismissal**"), with respect to that certain case entitled *Raines Feldman LLP v. Erik Syverson, et al.*, Los Angeles Superior Court Case No. SS027114, and take all steps otherwise necessary to file, or cause to be filed, with the Los Angeles County Superior Court, the complete dismissal of all disputes and causes of action between or among the parties with prejudice within two (2) business days of delivery of the Take Down Notice or the expiration of Syverson's right to revoke under Section 7b, whichever is later.

12. **Representations and Warranties – Syverson**. Syverson hereby represents and warrants to the RF Parties as follows:

a. Authority. The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby have been duly and validly authorized by all necessary actions of Syverson, none of which actions has been modified or rescinded and all of which actions are in full force and effect. This Agreement constitutes and, upon execution and delivery will constitute, a valid and binding agreement and obligation of Syverson, enforceable in accordance with its terms.

party shall be entitled to recover from the offending parties (on a joint and several basis) liquidated damages in the amount of Twenty Five Thousand Dollars ($25,000.00) per single publication. ALL PARTIES AGREE THAT THE LIQUIDATED DAMAGES SET FORTH HEREIN ARE PRESUMED TO BE THE REASONABLE AMOUNT OF DAMAGE ANTICIPATED FOR A BEACH OF THIS SECTION 9, AND FURTHER AGREE THAT IT WOULD BE IMPRACTICAL OR EXTREMELY DIFFICULT TO FIX THE ACTUAL DAMAGES DUE TO A BREACH.

*Syverson Initials Agreeing to Liquidated Damages Clause*

______________

*RF Parties Initials Agreeing to Liquidated Damages Clause*

10. **Duplicative Website Content**. The RF Parties covenant and agree that, within twenty four (24) hours of the Effective Date, the RF Parties will instruct Justia in writing to commence the removal of all content and meta-data identified on Exhibit "A" attached hereto (the "Duplicative Content") from the firm's website (www.raineslaw.com) (the "Website"). The parties acknowledge and agree that, RF shall not be prohibited from creating its own content on subject matters similar to the subject matter discussed in the Duplicative Content, but that RF shall not use the Duplicative Content on the Website subsequent to the Effective Date. RF shall provide Syverson with a copy of the written request to remove Duplicative Content within 24 hours of propounding said written notice to Justia.

11. **Dismissal of Action**. For and in consideration of the covenants, promises and representations and warranties of the parties set forth herein, the parties shall execute and deliver that certain Stipulated Dismissal of Action with Prejudice attached hereto as Exhibit "B" (the "**Dismissal**"), with respect to that certain case entitled *Raines Feldman LLP v. Erik Syverson, et al.*, Los Angeles Superior Court Case No. SS027114, and take all steps otherwise necessary to file, or cause to be filed, with the Los Angeles County Superior Court, the complete dismissal of all disputes and causes of action between or among the parties with prejudice within two (2) business days of delivery of the Take Down Notice or the expiration of Syverson's right to revoke under Section 7b, whichever is later.

12. **Representations and Warranties – Syverson**. Syverson hereby represents and warrants to the RF Parties as follows:

a. Authority. The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby have been duly and validly authorized by all necessary actions of Syverson, none of which actions has been modified or rescinded and all of which actions are in full force and effect. This Agreement constitutes and, upon execution and delivery will constitute, a valid and binding agreement and obligation of Syverson, enforceable in accordance with its terms.

b. No Conflicts. The execution and delivery of this Agreement and the performance of the obligations of Syverson hereunder, as applicable, does not and will not conflict with or constitute a default under any contract, agreement, lease, commitment or understanding to which Syverson is a party.

c. Litigation and Proceedings. Except as described herein, there are no actions, suits or proceedings pending or overtly threatened against or affecting the Syverson, at law or in equity, or before or by any governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, or before any arbitrator of any kind, that relate directly or indirectly to the transactions contemplated by this Agreement.

d. Survival; Indemnification. All representations and warranties set forth herein will remain operative and in full force and effect, and will survive the Effective Date and the delivery of all consideration and documents under this Agreement. Syverson shall defend, indemnify and hold harmless the RF Releasees from and against any claim (including the payment of attorneys' fees and costs actually incurred whether or not litigation is commenced) based on or in connection with a breach of the representations and warranties contained in this Section 12.

13. **Representations and Warranties – RF Parties.** The RF Parties hereby represent and warrant to Syverson as follows:

a. Authority. The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby have been duly and validly authorized by all necessary actions of the RF Parties, none of which actions has been modified or rescinded and all of which actions are in full force and effect. This Agreement constitutes and, upon execution and delivery will constitute, a valid and binding agreement and obligation of each of the RF Parties, enforceable in accordance with its terms.

b. No Conflicts. The execution and delivery of this Agreement and the performance of the obligations of the RF Parties hereunder, as applicable, does not and will not conflict with or constitute a default under any contract, agreement, lease, commitment or understanding to which any of the RF Parties are a party.

c. Litigation and Proceedings. Except as described herein, there are no actions, suits or proceedings pending or overtly threatened against or affecting the RF Parties, at law or in equity, or before or by any governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, or before any arbitrator of any kind, that relate directly or indirectly to the transactions contemplated by this Agreement.

d. Survival; Indemnification. All representations and warranties set forth herein will remain operative and in full force and effect, and will survive the Effective Date and the delivery of all consideration and documents under this Agreement. The RF Parties shall

jointly and severally defend, indemnify and hold harmless Syverson from and against any claim (including the payment of attorneys' fees and costs actually incurred whether or not litigation is commenced) based on or in connection with a breach by any of the RF Parties of the representations and warranties contained in this Section 13.

14. **Non-Admission of Discrimination or Wrongdoing.** This Agreement shall not in any way be construed as an admission that the parties, or any individual, has any liability to, or acted wrongfully in any way with respect to, the parties or any other person.

16. **Tax Liability.** The RF Parties' payment to Syverson described above in paragraph 1 represents a compromise of Syverson's claims against the RF Parties. Syverson recognizes that the RF Parties are not withholding any federal or state income taxes, FICA or any other type of payroll deduction from the Settlement amount and that no FICA contribution is being made by the RF Parties on such payment. Syverson agrees that any liability for state or federal income tax payments or penalties arising from said payment shall be Syverson's sole responsibility. Syverson understands and agrees that the RF Parties are neither providing tax nor legal advice, nor making representations regarding tax obligations or consequences, if any, related to this Agreement. Syverson further understands and agrees that the RF Parties will have no obligation to defend any action brought against Syverson by any taxing authority.

17. **Miscellaneous.**

a. Entire Agreement. This Agreement embodies the entire agreement of all the parties hereto who have executed it and supersedes any and all other agreements, understandings, negotiations, or discussions, either oral or in writing, express or implied, between the parties to this Agreement. The parties to this Agreement each acknowledge that no representations, inducements, promises, agreements or warranties, oral or otherwise, have been made by them, or anyone acting on their behalf, which are not embodied in this Agreement; that they have not executed this Agreement in reliance on any representation, inducement, promise, agreements, warranty, fact or circumstances, not expressly set forth in this Agreement; and that no representation, inducement, promise, agreement or warranty not contained in this Agreement including, but not limited to, any purported settlements, modifications, waivers or terminations of this Agreement, shall be valid or binding, unless executed in writing by all of the parties to this Agreement. This Agreement may be amended, and any provision herein waived, but only in writing, signed by the party against whom such an amendment or waiver is sought to be enforced.

b. Further Documents and Acts. The parties hereby agree to cooperate with each other after the date hereof and without further consideration to execute, deliver, record and publish as may be necessary or appropriate to effectuate the transactions contemplated herein, and each party hereto shall do or perform such further acts and things and execute and deliver such further certificates, instruments and other documents as may be required by the other party hereto to implement the intent of the parties as expressed in this Agreement.



JW

c. Equitable Remedies. The parties acknowledge and agree that each party may be irreparably injured by a violation of this Agreement and agree that in addition to any other remedies available to it for such breach or threatened breach, on meeting the standards required by law, will be entitled to a preliminary injunction, temporary restraining order, or other equivalent relief or otherwise restraining the offending party from any actual or threatened breach of this Agreement. If a bond is required to be posted in order to secure an injunction or other equitable remedy, the parties agree that said bond need not be more than Ten Thousand Dollars ($10,000).

d. Notices. Any notice, demand, document or other communication which any party is required or may desire to give, deliver or make to the other party shall be in writing, and may be personally delivered or given or made by United States registered or certified mail, return receipt requested, by overnight delivery service (e.g., Federal Express or other similar service), or by facsimile or email transmission with printed confirmation of receipt, addressed as follows:

| | |
|---|---|
| If to Syverson : | Erik Syverson<br>101 Painted Turtle Lane<br>Chapel Hill, NC 27516-4337<br>Email: erik@syversonlaw.com |
| If to the RF Parties: | Raines Feldman LLP<br>1800 Avenue of the Stars, 12th Floor<br>Los Angeles, CA 90067<br>Phone: 310-440-4100<br>Attn: Jonathan Littrell<br>Email: jlittrell@raineslaw.com |

Any party may designate a different address for itself by notice similarly given. Any notice, demand or document so given, delivered or made by United States Mail shall be deemed to have been given seventy-two (72) hours after the same is deposited in the United States Mail as registered or certified matter, addressed as provided above, with postage fully prepaid. Any notice, demand or document delivered by overnight delivery service (e.g. Federal Express) shall be deemed complete upon actual delivery or attempted delivery provided such attempted delivery is made on a business day. Any notice given by facsimile or email shall be deemed delivered when sent if sent before 5:00 p.m. (Pacific Time) on the business day sent; otherwise, delivery shall be deemed to have occurred on the next business day. Any notice, demand or document given by personal service shall be deemed to be given, delivered and made upon receipt of the same by the party to whom the same is to be given or delivered. Any party may change its address, email or facsimile number for notice purposes by giving notice to the other party.

e. Governing Law; Venue. This Agreement will be construed in accordance and governed by the laws of the State of California. The parties consent to the venue and jurisdiction of the courts of the State of California and of the United States, in each case located in Los



ES

Angeles County, California, for the adjudication of any disputes arising out of or relating to this Agreement.

f. <u>Dispute Resolution; Attorney's Fees, Waiver of Jury Trial</u>. Any controversy, dispute or claim between the parties shall be settled by binding arbitration, at the request of either party. The arbitrability of any controversy, dispute or claim under this policy shall be determined by application of the substantive provisions of the Federal Arbitration Act (9 U.S.C. Sections 1 and 2) and by application of the procedural provisions of the California Arbitration Act. Arbitration shall be the exclusive method for resolving any dispute, provided, however, that either party may request provisional relief from a court of competent jurisdiction, as provided in California Code of Civil Procedure Section 1281.8. The claims which are to be arbitrated under this policy include, but are not limited to, legal and equitable claims for defamation, interference, breach of trade secret law, claims regarding breaches of confidentiality, violation of non-disparagement and non-solicitation provisions, claims for wages and other compensation, claims for breach of contract (express or implied), claims for violation of public policy, wrongful termination, tort claims, claims for unlawful discrimination (including, but not limited to, race, religious creed, color, national origin, ancestry, physical disability, mental disability, gender identity or expression, medical condition, marital status, age, pregnancy, sex or sexual orientation) to the extent allowed by law, and claims for violation of any of the federal, state, or other government law, statute, regulation, or ordinance, except for criminal claims or claims for workers' compensation, unemployment insurance benefits and petitions or charges that could be brought before the National Labor Relations Board. The disputing parties will select an arbitrator by mutual agreement. If the disputing parties are unable to agree on a neutral arbitrator, they shall submit the dispute to the Judicial Arbitration and Mediation Service ("**JAMS**") and utilize the rules and procedures of JAMS to choose an arbitrator. The rules for JAMS may be found online at http://www.jamsadr.com. The demand for arbitration must be in writing and must be made by the aggrieved party within the statute of limitations period provided under applicable California and/or federal law for the particular claim. Failure to make a written demand within the applicable statutory period constitutes a waiver to raise that claim in any forum. Arbitration proceedings will be held in the City and County of Los Angeles, California. The arbitrator shall apply applicable California and/or federal substantive law to determine issues of liability and damages regarding all claims to be arbitrated, and shall apply the California Evidence Code to the proceeding. The parties shall be entitled to conduct all discovery to which they would have been entitled to had the parties' controversy been filed in a California Superior Court and the arbitrator shall have the power to limit such discovery pursuant to motions and protective orders under the same rules and limitations as if he were a California Superior Court judge. The arbitrator shall hear motions for summary disposition as provided in the California Code of Civil Procedure. Unless otherwise specified in this arbitration policy, the arbitrator shall rely on the California Arbitration Act, Cal. Civ. Proc. Code § 1282 et seq., to conduct the arbitration and any pre-arbitration activities. Within thirty (30) days following the hearing and the submission of the matter to the arbitrator, the arbitrator shall issue a written opinion and award which shall be signed and dated. The arbitrator's award shall decide all issues submitted by the parties, and the arbitrator may not decide any issue not submitted. The arbitrator shall prepare in writing and provide to the parties a decision and award which includes factual findings and the reasons upon which the decision is based. The arbitrator shall be permitted to award only those remedies in



RV

law or equity which are requested by the parties and allowed by law. The final award may be appealed to another arbitrator who will be chosen by the parties in the same manner as the original arbitrator. All the rules governing judicial appeals of judgments from the Superior Court shall apply to any appeal of this award, including but not limited to the time frames, deadlines and the standards of review. The cost of the arbitrator and other incidental costs of arbitration that would not be incurred in a court proceeding shall be borne equally by the parties. The parties shall each bear their own costs and attorneys' fees in any arbitration proceeding, provided, however, that the arbitrator shall have the authority to require either party to pay the costs and attorneys' fees of the other party, as is permitted under federal or state law, as a part of any remedy that may be ordered. THE PARTIES UNDERSTAND THAT BY USING ARBITRATION TO RESOLVE DISPUTES THEY ARE GIVING UP ANY RIGHT THAT THEY MAY HAVE TO A JUDGE OR JURY TRIAL WITH REGARD TO ALL ISSUES CONCERNING THIS AGREEMENT.

g. <u>Confidentiality</u>. The parties agree that the terms of this Agreement are to be kept confidential. Any disclosure with respect to the existence, substance or contents of this Agreement shall be limited to the following words "the matter has been settled and the terms are confidential." Such confidentiality will not preclude any party from disclosing the existence of this Agreement to the extent required to comply with applicable law or regulations, to the parties' respective attorneys, accountants, partners and insurers where reasonably necessary, when so required for state or federal tax purposes, when so required to implement the terms of this Agreement, to seek redress for an alleged breach, or in response to any lawful subpoena or other legal process. The parties further agree that no duly authorized third party (such as a mediator or arbitrator) shall be subject to this provision.

h. <u>General</u>. The section and paragraph headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement. This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, all of which together shall constitute one and the same instrument. Facsimile and Portable Document Format (PDF) reproductions of original signatures shall be binding for the purpose of the executing and enforcing this Agreement. Should any portion, word, clause, phrase, sentence or paragraph of this Agreement be declared void or unenforceable, such portion shall be considered independent and severable from the remainder, the validity of which shall remain unaffected. This Agreement shall not be construed in favor of one party or against the other. The failure to insist upon compliance with any term, covenant or condition contained in this Agreement shall not be deemed a waiver of that term, covenant or condition, nor shall any waiver or relinquishment of any right or power contained in this Agreement at any one time or more times be deemed a waiver or relinquishment of any right or power at any other time or times. This Agreement, and all the terms and provisions contained herein, shall bind the heirs, personal representatives, successors and assigns of each party, and inure to the benefit of each party, its agents, directors, officers, employees, servants, successors, and assigns. This Agreement may not be modified, altered or changed except upon express written consent of both Parties.

[*Signature page to follow*]

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

**"RF PARTIES"**

**Raines Feldman LLP,**
a California limited liability partnership

By: ______________________
Name: Jonathan Littrell
Its: Managing Partner

By: ______________________
Andrew Raines, an individual

By: ______________________
Miles Feldman, an individual

By: ______________________
Robert Pardo, an individual

By: ______________________
Richard Decker, an individual

By: ______________________
Jonathan Littrell, an individual

[*Signature Page for Syverson to Follow*]

[
*S*
*i*
*g*
*n*
*a*
*t*
*u*
*r*
*e*

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

**By signing this Agreement, the undersigned certify that the undersigned; (i) has carefully read and fully understands this Agreement, (ii) was advised by RF in writing, via this Agreement, to consult with an attorney before signing this Agreement, (iii) has had an opportunity to be represented by legal counsel of his, her or its own choice throughout all of the negotiations which preceded this Agreement and in connection with the negotiation, preparation and execution of this Agreement, (iv) agrees to the terms knowingly, voluntarily and without intimidation, coercion or pressure, and (v) has had up to twenty-one (21) days to consider the terms of this Agreement, and has seven (7) days to revoke the Agreement after its execution, provided, however, that in the event of such a revocation, he, she or it will forfeit and immediately return to RF any and all benefits and consideration which the RF Parties are obligated to provide under this Agreement.**

By: ______________________
Erik Syverson, an individual



Case 1:19-cv-00217-CCE-LPA Document 1-1 Filed 02/25/19 Page 29 of 34

# EXHIBIT B

Gmail by Google

Erik Syverson <eriksyverson@syversonlaw.com>

# Today's letter regarding Raines Feldman

12 messages

**Syversonlaw** <eriksyverson@syversonlaw.com> Thu, May 17, 2018 at 4:02 PM
To: John.Barber@lewisbrisbois.com, laura.anson@lewisbrisbois.com

John and Laura, you both sent me a letter today that I disagreed with, however, you provided a very short time to meet the demand in the letter. I have tried reaching you both today to confirm you are satisfied however neither of you have answered the phone. I am leaving Los Angeles soon and am booked up with appointments. Please confirm the issues raised in your letter are resolved. The picture in question has been deleted. All rights reserved

Sent from my iPhone

---

**Anson, Laura** <Laura.Anson@lewisbrisbois.com> Thu, May 17, 2018 at 7:15 PM
To: Syversonlaw <eriksyverson@syversonlaw.com>
Cc: "Barber, John" <John.Barber@lewisbrisbois.com>

Eric,

I have been tied up in court today. If the Tweet has been deleted, then the issue is resolved.

Laura Anson

Sent from my iPhone

Laura J. Anson
Partner
Laura.Anson@lewisbrisbois.com
Lewis Brisbois Bisgaard & Smith LLP
650 Town Center Drive, Suite 1400
Costa Mesa, CA 92626
T:714.668.5535 F: 714.850.1030 M: 949.280.7542

www.LewisBrisbois.com

This e-mail may contain or attach privileged, confidential or protected information intended only for the use of the intended recipient. If you are not the intended recipient, any review or use of it is strictly prohibited. If you have received this e-mail in error, you are required to notify the sender, then delete this email and any attachment from your computer and any of your electronic devices where the message is stored.
[Quoted text hidden]

---

**Syversonlaw** <eriksyverson@syversonlaw.com> Thu, May 17, 2018 at 7:25 PM
To: "Anson, Laura" <Laura.Anson@lewisbrisbois.com>
Cc: "Barber, John" <John.Barber@lewisbrisbois.com>

Thanks for getting back to me Laura and I hope you had much success today in court. Indeed the tweet is deleted and so I will consider all resolved. Thank you for your professionalism and responsiveness at a time in my life when my health is very challenged.

Sent from my iPhone
[Quoted text hidden]

---

**Erik Syverson** <erik@syversonlaw.com> Thu, Jul 5, 2018 at 9:16 PM
To: John Metzidis <john@thegolawfirm.com>, Allen Grodsky <allen@thegolawfirm.com>

# EXHIBIT C

SYVERSON, LESOWITZ & GEBELIN LLP

Erik Syverson
8383 Wilshire Blvd., Suite 520
Beverly Hills, California 90211
310-270-6000
erik@syversonlaw.com

February 3, 2019

VIA UPS
Raines Feldman, LLP

1800 Avenue of the Stars, 12th Floor

Los Angeles, CA 90067

Attn: Jon Littrell

Re: Termination of Settlement Agreemnet

Dear Raines Feldman,

Jon Littrell has breached section 9d of our settlement agreement. As such, I hereby exercise my termination rights per section 1c.

Sincerely,

Erik Syverson
Syverson, Lesowitz & Gebelin LLP

SYVERSON, LESOWITZ & GEBELIN LLP

**Erik Syverson**
8383 Wilshire Blvd., Suite 520
Beverly Hills, California 90211
310-270-6000
erik@syversonlaw.com

February 7, 2019

VIA UPS
Raines Feldman, LLP

1800 Avenue of the Stars, 12th Floor

Los Angeles, CA 90067

Attn: Jon Littrell

Re: Termination of Settlement Agreemnet

Dear Raines Feldman,

Your petition to compel arbitration violates section 9d of our settlement agreement. As such, I hereby exercise my termination rights per section 1c.

Sincerely,

Erik Syverson
Syverson, Lesowitz & Gebelin LLP