19 CV 000245

STATE OF NORTH CAROLINA
COUNTY OF ORANGE

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
FILE NUMBER:

ERIK SYVERSON,

Plaintiff,

vs.

RAINES FELDMAN, LLP, MILES FELDMAN, JONATHAN LITTRELL, RICHARD DECKER, ANDREW RAINES, ROBERT PARDO, AND JOHN DOE 1-10,

Defendants

**COMPLAINT**
**FOR DECLARATORY JUDGMENT,**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS,**
**JURY TRIAL DEMANDED**

The Plaintiff, Erik Syverson, complaining of the Defendants, Raines Feldman, LLP ("Raines"), John Doe 1-10 ("Does"), Miles Feldman aka "malpractice miles", Jonathan Littrell, Richard Decker aka "Richie the rug", Andrew Raines, and Robert Pardo, collectively referred to herein as ("Defendants"), alleges and says:

**PARTIES**

1. The Plaintiff, Erik Syverson, is a citizen and resident of Orange County, North Carolina. In May 2017 Plaintiff was diagnosed with a brain tumor at Cedars Sinai hospital in Los Angeles, California. Plaintiff underwent treatment for the brain tumor in Los Angeles until December 2017 when Plaintiff moved to Chapel Hill, NC in order to continue treatment at Duke University's world-renowned Tisch brain tumor center.
2. Defendant Raines is a California limited liability partnership operating as a law firm in Los Angeles, California at 1800 Avenue of the Stars, 12th Floor.
3. Defendant Miles Feldman is a partner at Raines and commonly known in the Los Angeles legal community as "malpractice Miles" due to several malpractice lawsuits filed against him during his career in addition to poor outcomes for clients as well as difficulty collecting attorney fees from clients.
4. Defendant Jonathan Littrell is managing partner of Raines despite having never worked at another law firm in his career much less serve as a managing partner. His practice is devoted to facilitating the financing of and distribution of drugs deemed illegal under federal law.

5. Defendant Richard Decker is known as "Richie the rug" in the Los Angeles legal community due to his fake hair as well as history of mistreatment of female co-workers. While plaintiff was employed at Raines, "the rug" unilaterally terminated Plaintiff's secretary because she made "the rug" feel uncomfortable. No further explanation was offered as Plaintiff's secretary worked for Plaintiff and not "the rug". Additionally, "the rug" encourages his associates to overbill his health insurance clients such as Anthem Blue Cross. Once caught by his clients, "the rug" offered up his only female associate as a sacrificial lamb. "The rug" terminated her just after she gave birth to a baby boy.

6. Defendants Robert Pardo and Andrew Raines are a long time homosexual married couple and founded Raines over a decade ago prior to their marriage in California.

7. Whenever any reference is made herein to the term "Does", this shall refer not only to Does, but shall also include their respective employees, agents, servants, contractors, subcontractors, predecessor corporations or companies, successor corporations and companies, subsidiaries, divisions and assigns, and in all respects, those persons acting at the direction of, on behalf of, or at the request of, Does.

**JURISDICTION**

8. Plaintiff requests declaratory relief against Defendants, pursuant to Rule 57 of the Rules of Civil Procedure and the Uniform Declaratory Judgment Act, N..C Gen. Stat. 1-253 and 1-254, *et seq*. This Court has jurisdiction of this action and authority to issue a declaratory judgment in this action pursuant to the provisions of the Uniform Declaratory Judgment Act, N.C. Gen. Stat. 1-253 and 1-254, *et seq*., because an actual controversy exist between Plaintiff and Defendants with respect to the construction of an agreement entered into between Plaintiff and Defendants in February, 2018 (the "agreement"). A true and accurate copy of the agreement is attached hereto as Exhibit A.

**THE MAN WHO KNEW TOO MUCH, FACTS COMMON TO ALL CLAIMS FOR RELIEF**

9. While working at Raines, Syverson witnessed a shocking amount of misdeeds and illegal behavior committed by Raines and its lawyers Andrew Raines, Robert Pardo, Jonathan Littrell, Richard Decker and Miles Feldman. This behavior includes aiding and abetting the financing of the illegal drug trade in violation of the RICO act and federal narcotics laws, abuse of women, pressure to donate to certain political candidates and intolerance of traditional family values including forcing women to work weekends during their maternity leave.

10. Raines lawyers Jonathan Littrell, Andrew Raines, Robert Pardo all performed a staggering amount of legal work to enable the financing and distribution of marijuana and other schedule 1 narcotics. Marijuana is illegal under federal law and classified as a schedule 1 narcotic. Raines and the forementioned lawyers all knew this. Despite knowing its illegality, Raines and its lawyers performed a massive amount of work for a company called Med Men. Med Men finances and invests in the marijuana trade. In fact, Raines performed so much work for Med Men that it embedded its managing partner Jonathan Littrell onsite at Med Men's Culver City offices. Raines did so even though it jeopardized its relationship with its largest client Brad Cohen and Cohen Asset Management ("CAM"). Raines pulled Littrell off CAM legal matters so that he could work on Med Men marijuana matters. Raines did not inform CAM timely of this change. In fact, knowing the illegality of Littrell's work for Med Men, Andrew Raines sent a firm wide memo advising all employees to shut up and not talk about Littrell's placement onsite at Med Men.

11. Plaintiff did not take kindly to Raines' work in marijuana finance. Plaintiff personally advised many Raines lawyers to not work on such matters because it could subject them and others to criminal prosecution under many federal statutes including the RICO Act. Such objections did not make Plaintiff popular with Andrew Raines, Miles Feldman, Jonathan Littrell and Robert Pardo.

12. In order to launder drug money, Andrew Raines advised Plaintiff that he and his husband Robert Pardo, had formed many shell LLC's to participate in the marijuana trade. It is

unknown whether there was ever any crossover between CAM funds and Med Men funds in Raines' trust account or operating accounts.

13. Often, in order to distance themselves from the marijuana work, partners Andrew Raines, Robert Pardo, and Jonathan Littrell would employ young, inexperienced and naïve lawyers to do their dirty work. For example, a favorite Raines' tactic would be to hire low level law school graduates in desperate need of employment. Only there was one problem with this scheme, most could not pass the California bar exam. Five of six such hires failed the bar exam. An embarrassing percentage by any standard. Nevertheless, such youthful lawyers were kept around to do Med Men dirty work to the extent they could. This provided the buffer zone Andrew Raines and Robert Pardo needed. Plausible deniability.

14. Raines kept up its marijuana work fully aware that it violated federal law. Upon the appointment of AG Jeff Sessions, Raines corporate department held a meeting to discuss the likelihood of criminal prosecution against the firm and its lawyers. Consensus was, at Raines, that Donald Trump would be impeached, Sessions would be gone or too weak to prosecute and the financial reward outweighed the criminal risk.

15. In order to send a signal that marijuana was the future of Raines, upon being embedded onsite at Med Men, Jonathan Littrell was appointed managing partner of the firm. This title was awarded by Robert Pardo, the outgoing managing partner, despite the fact that Jonathan Littrell was by far, the most inexperienced, least credentialed lawyer at Raines. He was only approximately thirty-five years old at the time of appointment and had never worked at any law firm other than Raines. His only apparent success had been that he brought Med Men into the firm as a client. Raines wanted to send the signal that crime pays and it pays handsomely at Raines.

16. Abuse of women was rampant at Raines, a firm founded by two married men, Andrew Raines and Robert Pardo. In particular, Robert Pardo made his contempt for women no secret. Upon the hiring of openly Lesbian partner, Robert Pardo referred to her as the "man dude" and difficult – typical of Lesbians according to the openly gay Robert Pardo. Robert Pardo also

often commented that all women, including his sisters and mother were nuts and difficult. He espoused that is why he chose a gay lifestyle because women are too difficult to get along with. This bore true for Robert Pardo and Richard Decker.

17. Richard Decker's problems with women were well known at Raines.

18. Richard Decker has a very specialized practice representing health insurers in arbitration proceedings against hospitals. Because of the nature of his work, he and his team of lawyers could not charge high hourly rates and could not attract well credentialed talent. Therefore, in order to make the money he needed, Richard Decker encouraged his team of lawyers to overbill their time in order to make his numbers. When clients objected to this overbilling, Richard Decker always had a fall guy or, more accurately, fall lady.

19. One such unfortunate lady, Jane Doe 1 was fired by Richard Decker shortly after giving birth to her first child. Richard Decker encouraged her to bill clients like Blue Cross and HealthNet very aggressively yet blamed her when she did so and fired her. Not satisfied with firing her, when she threatened to sue Raines, Richard Decker embarked on a character assassination campaign. Jane Doe 1, the daughter of Persian immigrants, was just another money hungry Persian woman according to Richard Decker. In order to silence Jane Doe 1, Raines resorted to its standard playbook – the confidential settlement.

20. Richard Decker's cruelty and mis-treatement of women extended beyond those women working directly for him. He had Plaintiff's secretary ("Jane Doe 2") fired simply because she made him feel "uncomfortable" in the hallways and elevators of the firm. Plaintiff was very happy with Jane Doe 2's performance. Nevertheless, Richard Decker and Robert Pardo fired he,r despite the fact that she was battling a life-threatening chronic illness and that Plaintiff, her supervising partner, was happy with her work.

21. Former partner Sonia Lee is another woman who was blamed for the failures of men at Raines. This time Miles Feldman was the lawyer in need of a fall lady. Feldman, is a name partner at Raines and the titular head of litigation. However, by most objective accounts and according to most Raines lawyers, he is a complete and utter failure and embarrassment to the

firm. Many former Raines lawyers left the firm in part due to Feldman's incompetence, lack of business and firm worst collection rate.

22. In 2017, with his embarrassing performance becoming hard to ignore, Feldman fired Sonia Lee because "she was bringing down the entire litigation department". Sonia Lee had no effect on Plaintiff's business which generated seven figures annually for Raines.

23. The Firm went through a collective mental breakdown with the election of Donald Trump as President. With many well known Republican clients such as Andrew Puzder, Plaintiff further placed himself in the crosshairs of Raines management.

24. The day after Trump's election, Andrew Raines called a firm wide meeting during which Robert Pardo threw a temper tantrum calling Trump and all his supporters Nazis. When Plaintiff reminded Robert Pardo that many if not most Raines clients were Republican real estate investors/developers, Robert Pardo stated "we do not represent any Republicans and never will". Such unhinged behavior by a managing partner, including several anti-Republican tweets, made it impossible for Plaintiff to remain at Raines. At the time of Trump's election and the ensuing Raines meltdown, Plaintiff represented many prominent Republicans in addition to liberal luminaries including several Academy Award winning Actors.

25. On the other hand, Feldman had no such prominent clients. When Plaintiff fell ill with brain cancer, Feldman saw his chance to meddle in Plaintiff's thriving litigation practice specializing in cyber liability matters.

26. Plaintiff clung to life in the ICU at Cedars Sinai hospital in October 2017 from severe chemotherapy side effects. To be specific, Plaintiff had no immune system left, zero white blood cells and no platelets. At the same time, Feldman advised Plaintiff's associates and team of lawyers not to work too much on Plaintiff's matters because his future was uncertain. This type of cowardly betrayal was typical of Feldman's jealous, passive aggressive demeanor. When brought to Plaintiff's attention, he immediately notified Jonathan Littrell

and Andrew Raines. Not only were Plaintiff's phone calls and concerns ignored, Littrell blamed Plaintiff for making the report referring to it as inappropriate.

27. After Littrell referenced Plaintiff's actions as inappropriate, Littrell cut off Plaintiff's health insurance and bi-monthly partner draw. In turn, Plaintiff left the firm immediately and founded the law firm of Syverson, Lesowitz & Gebelin, LLP in Beverly Hills, CA the same week he moved his family to Chapel Hill.

28. Although Plaintiff had left Defendants behind, Defendants could not leave behind their animus toward Plaintiff. Defendants then embarked on a harassment campaign. Having left Raines, Plaintiff revealed publicly the misdeeds performed by Defendants via social media on his Twitter account and LinkedIn. Obviously, embarrassed greatly by their behavior, Defendants sought to buy Plaintiff's silence via the agreement.

29. The agreement provides for arbitration of any disputes related to the agreement. It also provides a termination clause that may be invoked by the non-breaching party.

30. Defendants immediately began to use the agreement as a tool of constant harassment. This began in April 2018 when Plaintiff, back in Los Angeles for the first time since completing cancer treatment and moving to Chapel Hill, took a picture in front of the building he used to work in. In a fit of unfathomable pettiness, Defendants refused to allow Plaintiff into his office to reclaim his personal effects after resigning. The picture taken was in front of a sign identifying tenants Wells Fargo and Raines. Plaintiff posted the picture on his Twitter account to celebrate his survival of brain cancer. The next day, Plaintiff received an email from attorney Laura Anson of Lewis Brisbois claiming that the picture violated the agreement and requested that it be removed. Plaintiff disagreed but for the sake of moving on immediately removed it. Ms. Anson agreed that this removal solved the issue and waived any legal claims resulting from the picture. A true and correct copy of Ms. Anson's waiver is attached hereto as Exhibit "B".

31. Despite this clear and unequivocal waiver, Defendants have continued to use this picture as the basis of a never-ending arbitration campaign of harassment toward Plaintiff. This

campaign is intended to cause Plaintiff both financial and emotional damage and distress. Defendants have used the picture as a basis of no less than three frivolous arbitration demands before JAMS. Each and every JAMS arbitrator assigned has been in the pocket of Defendants having relied upon Defendants for high volumes of business. As such, each JAMS arbitrator, all four, have been disqualified for conflicts of interest. The fix is in.

32. In addition to the picture claim, Defendants have leveled a number of other frivolous claims against Plaintiff in various iterations of the demand for arbitration. Such ridiculous claims include that Plaintiff harassed and interfered with Defendants' business merely by serving third party deposition subpoenas in relation to a lawsuit Plaintiff filed in this Court in July 2018. In that case entitled Syverson v. John Doe, an anonymous tortfeasor sent harassing emails to Plaintiff claiming to work at Raines and be of relation to Andrew Raines. Plaintiff never filed suit against Defendants. Opting for the cautious approach, Plaintiff sued John Doe and served subpoenas on various lawyers at Raines so that they could clear their name under oath. Relevant Internet service providers such as Google were also subpoenaed. Plaintiff's lawsuit was successful in identifying the John Doe defendant so quickly that he withdrew all deposition subpoenas served upon Raines and its employees. Plaintiff reached a confidential settlement with John Doe and per the agreement, John Doe's identity is confidential. Nevertheless Defendants continue to use a lawsuit where they were merely third party witnesses as a means to harass and instigate pointless demands for arbitration.

33. Tired of the continued harassment, when Plaintiff learned that Jonathan Littrell had violated the agreement, Plaintiff invoked the termination clause meaning that Plaintiff was no longer bound by the terms of the agreement, however, the Defendants continue to be bound. Furthermore, Defendants filed a motion to compel yet another frivolous arbitration in Santa Monica, CA after receiving Plaintiff's termination notice. Providing further grounds for termination of the agreement, Defendants attached a demand for JAMS arbitration that severely disparaged Plaintiff. As such, even though unnecessary, Plaintiff served Defendants with yet another termination of the agreement.

34. Despite the termination of the agreement, Defendants persist in pursuing frivolous claims before a compromised adr provider ("JAMS"). Defendants dispute that the agreement has been terminated. A real and ripe controversy exists in that Plaintiff asserts the agreement has been terminated. True and correct copies of the terminations are attached hereto as Exhibit "C".

**FIRST CLAIM FOR RELIEF**

**INTENTIONAL INFLICATION OF EMOTIONAL DISTRESS**

35. Plaintiff hereby incorporates by reference the allegations of paragraphs 1 through 34 in support of this claim for relief.

36. The actions of the Defendants as alleged herein constitute extreme and outrageous conduct and show a reckless indifference to the likelihood that said actions would cause severe emotional distress to the Plaintiff.

37. The actions of the Defendants as set forth herein were undertaken for the purpose of embarrassing, humiliating, harassing and retaliating against the Plaintiff.

38. Defendants knew, or reasonably should have known, that their behavior would cause emotional distress to the Plaintiff, and, in fact, Defendants' conduct proximately resulted in injury and damage to the Plaintiff, as set forth herein.

39. Plaintiff's emotional distress, as a result of the actions of the Defendants alleged herein, was severe and disabling.

40. Plaintiff has suffered compensatory damages as a proximate result of the Defendants' conduct in an amount in excess of One million dollars ($1,000,000.00).

41. Defendants' conduct was extreme and outrageous and recklessly indifferent to the rights of Plaintiff and likely to cause severe emotional distress to Plaintiff, therefore justifying that Plaintiff receive punitive damages in an amount in excess of Three million Dollars ($3,000,000.00).

42. Plaintiff has been forced to incur attorney's fees in order to enforce his rights and is entitled to recover reasonable attorney's fees necessary for the prosecution of this action.

**SECOND CLAIM FOR RELIEF, CLAIM FOR DECLARATORY JUDGMENT**

43. Plaintiff repeats and re-alleges the allegations in Paragraphs 1 through 43 of this Complaint.

44. Plaintiff requests a declaratory judgment, pursuant to the provisions of Rule 57 of the Rules of Civil Procedure and the Uniform Declaratory Judgment Act, N.C. Gen. Stat. 1-253 and 1-254, *et seq.*, that the agreement has been terminated by Plaintiff and, as such, Plaintiff is no longer bound by any terms of the agreement, however, Defendants remain so bound.

45. An actual controversy exists between Plaintiff and Defendants with respect to the construction of the agreement.

46. The terms of the agreement clearly provide that upon a breach of the agreement, the non-breaching party may elect to terminate the agreement via written notice. Plaintiff provided such written termination notice. As such, the agreement has been terminated by Plaintiff and Plaintiff is no longer bound by its terms.

WHEREFORE, the Plaintiff prays that he recover of the Defendants, jointly and severally, as follows:

1. Compensatory damages for his injuries and damages for intentional infliction of emotional distress in an amount in excess of One million and 00/100 Dollars ($1,000,000.00), and punitive damages for his injuries and damages in an amount in excess of Three million Dollars ($3,000,000.00), plus interest from the date of filing of this Complaint until judgment is paid and satisfied in full, pursuant to N.C.G.S. 24-5;
2. Reasonable attorney fees, pursuant to N.C.G.S. 6-21.1 as an element of costs;
3. That all issues be tried by a jury;
4. That the Court issue a declaratory judgment, pursuant to the provisions of Rule 57 of the Rules of Civil Procedure and the Uniform Declaratory Judgment Act, N.C. Gen. Stat. 1-253 and 1-254, *et seq.*, declaring that the Agreement has been terminated and Plaintiff is not bound by its terms.
5. Such other and further relief as to the Court may seem just and proper.

This the Eighteenth day of February, 2019.

Erik Syverson, in pro per
101 Painted Turtle Lane
Chapel Hill, NC 27516